**WO** SH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DaJuan Torrell Williams,<br><br>    Plaintiff,<br><br>v.<br><br>Unknown Winget, et al.,<br><br>    Defendants. | No.  CV 19-05096-PHX-MTL (CDB)<br><br>**ORDER** |

Plaintiff DaJuan Torrell Williams, who is currently confined in Arizona State Prison Complex-Eyman, Browning Unit in Florence, Arizona, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 16.) Defendants move for summary judgment, and Plaintiff opposes.[1] (Docs. 74, 100.) Defendants filed a Reply. (Doc. 108). Also before the Court is Plaintiff's Motion for Temporary Restraining Order. (Doc. 112.) The Court will grant in part and deny in part the Motion for Summary Judgment and deny the Motion for Temporary Restraining Order.

**I.    Background**

On screening Plaintiff's First Amended Complaint (Doc. 16) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment excessive force claims against Correctional Officers (CO) Winget, Tribolet, Verdugo, Valencia, Villanueva, Cornejo, and Lopez in Counts One through Seven, and directed them to

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 77.)

answer. (Doc. 17.) The Court dismissed the remaining claims and Defendants. (*Id.*) Defendants Winget, Verdugo, Valencia, and Cornejo were subsequently dismissed from this action for failure to serve pursuant to Fed. R. Civ. P. 4(m). (Doc. 72.)

Plaintiff alleges that Defendant Tribolet banged him into walls and doorways while he was strapped to a gurney, with the intent to injure him, and force-shaved Plaintiff's face. (Doc. 16 at 6.) Plaintiff also alleges that Defendants Villanueva and Lopez choked him and attempted to shove his clothing into his mouth and throat on May 8, 2018. (*Id.* at 9, 11.)

Defendants Villanueva, Lopez, and Tribolet now move for summary judgment and argue that they did not use excessive force against Plaintiff. (Doc. 74.)

**II.     Motion for Injunctive Relief**

In his Motion, Plaintiff asserts that he is representing himself "in 5 legal matters, both criminal and civil" and that several non-party staff members at the Browning Unit have delayed returning Plaintiff's legal and personal property that he needs in order to litigate these cases. (*Id.* at 2–4.) Plaintiff moves the Court to order Defendants to "immediately issue, and/or give Plaintiff access to, his authorized personal property and legal materials" and to "enjoin[] the Defendants from, absent 'extraordinary circumstances,' withholding Plaintiff's personal property and legal materials in excess of 72 hours when and while Plaintiff has active and on-going legal matters before the courts." (Doc. 112 at 10.)

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without

an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Generally, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint[,]" and if a plaintiff seeks injunctive relief based on claims that were not raised in the complaint, the court does not have authority to issue an injunction. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). An exception to this rule exists where the preliminary injunction relates to a prisoner's access to the court, in which case "a nexus between the preliminary relief and the ultimate relief sought is not required[,]" and the court need not consider the merits of the underlying complaint. *Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (citing *Diamontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990)).

As an initial matter, it does not appear that Defendants Lopez and Villanueva are employed at the Browning Unit where Plaintiff is currently confined, and there is no evidence that they have the authority to make any decisions regarding Plaintiff's property. Thus, to the extent Plaintiff seeks injunctive relief from Defendants Lopez and Villanueva, and he is no longer in their custody or control, Plaintiff's request will be denied. *Hartmann v. Ca. Dep't of Corrections*, 707 F.3d 1114, 1127 (9th Cir. 2013) (stating that a plaintiff seeking injunctive relief must "identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief").

Moreover, Plaintiff does not allege that any of the named Defendants are responsible for denying or delaying his access to his property. Thus, even if the Court construes Plaintiff's allegations as an access-to-court claim, Plaintiff is not likely to succeed on the merits of the claim where he does not allege that any of the Defendants in this action are responsible for the purported unconstitutional behavior. A court may issue an injunction against a non-party only where the non-party acts in active concert or participation with an enjoined party. Fed. R. Civ. P. 65(d)(2) (a preliminary injunction only binds those who

receive actual notice of it by personal service or are parties, their officers, agents, servants, employees, and attorneys, and persons in active concert); *see Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). Plaintiff has not sufficiently shown that the non-parties named in his Motion were in active concert or participation with Defendants. Accordingly, Plaintiff's Motion will be denied.

### III.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**IV.    Relevant Facts**

    **A.    Defendants' Version of Events**

On May 8, 2018, Plaintiff was housed at the ASPC-Yuma, Dakota Unit. (Doc. 75 (Defs.' Statement of Facts) ¶ 1.) That day, during mealtime, the Incident Command System (ICS) was activated when Plaintiff assaulted Correctional Officer (CO) Luna-Reyes. (*Id.* ¶ 2.) Plaintiff had punched CO Luna-Reyes, refused directives from CO Escalante, and utilized a prison-made weapon to stab the officers attempting to get him under control. (*Id.* ¶ 3.) Plaintiff continued to refuse directives to stop and continued struggling with officers. (*Id.* ¶ 4.) Two bursts of pepper spray were utilized to gain control over Plaintiff. (*Id.* ¶ 5.) The officers were then able to direct Plaintiff to the ground and restrain him. (*Id.* ¶ 6.)

After Plaintiff was restrained, Defendant Sergeant Villanueva arrived on scene and escorted Plaintiff outside by taking him through the kitchen. (*Id.* ¶ 9.) Defendant CO II Lopez assisted with Villanueva's escort of Plaintiff. (*Id.* ¶ 12.) Defendants assert that as they escorted Plaintiff out of the kitchen, Plaintiff began to yell to the prisoner kitchen workers, who were unrestrained. (*Id.* ¶¶ 16, 18.)

Defendant Villanueva perceived, due to the nature of what Plaintiff was saying and the volume at which he was saying it, that Plaintiff was inciting them to riot. (*Id.* ¶ 20.) Defendant Villanueva asserts that he directed Plaintiff to stop yelling at the prisoner workers. (*Id.*) The prisoner workers responded to Plaintiff by standing and approaching Defendant Villanueva, Defendant Lopez, and Plaintiff. (*Id.* ¶ 21.) Defendant Villanueva perceived that Plaintiff's actions were a threat to the safety of the officers, Plaintiff, and the safety of the other prisoners. (*Id.* ¶ 22.)

When Plaintiff continued to yell at the prisoner workers, Defendant Villanueva covered Plaintiff's face with Plaintiff's shirt, and Defendant Villanueva shook, but did not deploy, his can of pepper spray to deter Plaintiff's actions. (*Id.* ¶ 23.) Defendant Villanueva directed the prisoner workers to return to where they had been and placed them on verbal report for obstructing staff. (*Id.* ¶ 24.) After the escort group passed the prisoners, Plaintiff was taken to a holding cell. (*Id.* ¶ 28.)

Defendants deny that Defendant Villanueva, or any other officer on the escort, attempted to choke Plaintiff with his shirt or place in him in a chokehold. (*Id.* ¶ 29.) Defendants deny that there was any application of force, other than covering Plaintiff's face with his shirt, used by Defendant Villanueva or any other officer on the escort. (*Id.* ¶ 30.)

On May 9, 2018, Plaintiff was transferred to the ASPC-Eyman, Browning Unit. (*Id.* ¶ 38.) In an informal complaint submitted by Plaintiff on May 13, 2018, Plaintiff claimed that upon his arrival to the Browning Unit, he was subjected to acts of retaliation from Defendant Sergeant Winget. (*Id.* ¶ 40.) Specifically, Plaintiff claimed that, upon his arrival to the Browning Unit, he was subjected to derogatory remarks and that, while strapped to a gurney, unknown officers and Defendant Winget purposely "banged" his arms into objects as they transported him. (*Id.* ¶ 41.) Plaintiff also claimed that when they finished transporting him to his cell, they ordered him to shave his beard, but only provided what Plaintiff identified as unsanitary hair clippers. (*Id.* ¶ 42.) Plaintiff claimed that when he refused to use these clippers, they held his arms and shaved his face. (*Id.* ¶ 43.)

In a separate informal complaint submitted by Plaintiff on May 14, 2018, Plaintiff claimed that Defendant Tribolet had harassed him and failed to provide him with hair clippers on May 11, 2018. (*Id.* ¶ 53.)[2]

. . .

---

[2] In their Statement of Facts, Defendants reference facts that were not included in Defendant Tribolet's declaration. (*See* Doc. 75 ¶¶ 44–51; Doc. 75-1 at 71–72 (Tribolet Decl.).) It appears that Defendants only submitted the first and last pages of Defendant Tribolet's declaration. (*See id.*) Facts that were not included in Defendant Tribolet's declaration or otherwise supported in the record will not be considered.

- 6 -

**B.    Plaintiff's Version of Events**

On May 8, 2018, an ICS was activated at the Dakota Unit due to prison staff being assaulted in the dining hall. (Doc. 101-1 (Pl. Decl.) ¶ 10.) Plaintiff admits that "[f]or nearly 50 seconds to a minute I was fighting with 2 officers . . ." (*Id.* ¶ 19.) During the incident, Plaintiff was sprayed in the face with "chemical agents." (*Id.*) An unnamed officer handcuffed Plaintiff and knelt on Plaintiff's back. (*Id.*) Plaintiff was then picked up and slammed against a wall by an unnamed individual and held there until the other prisoners cleared out of the dining hall. (*Id.*)

Plaintiff was then escorted through the kitchen by Defendants Lopez, Villanueva, and Cornejo. (*Id.* ¶ 11.) Defendant Lopez and CO Cornejo were each holding one of Plaintiff's arms. (*Id.*) As the group walked by the other prisoners who were in the outdoor building enclosure, one of the prisoners called Plaintiff's name, and Plaintiff said, "What's up?" (*Id.* ¶ 12.) The other prisoner asked if Plaintiff was "alright," and Plaintiff responded, "I'm good." (*Id.*) When asked by a prisoner what was happening, Plaintiff responded, "ain't nuttin [sic]. Just the same ol' [sic] [s---]. . ." (*Id.*) Plaintiff denies yelling at the other prisoners and asserts that Defendant Villanueva never ordered him to stop yelling because he was never doing so. (Doc. 101 ¶¶ 16, 20.) Plaintiff denies that the other prisoners stood up and approached the group as they were escorting Plaintiff through the kitchen area. (Doc. 101 ¶ 21.)

Plaintiff asserts that Defendant Villanueva started screaming, "Shut the [f---] up you [f---ing] [n-----]!" and yanked on Plaintiff's collar, choking him. (Doc. 101-1 ¶ 13.) Defendant Villanueva began trying to shove the collar of Plaintiff's sweatshirt into Plaintiff's mouth and down his throat, causing lacerations to Plaintiff's mouth and lips. (*Id.*) Defendant Villanueva continuing shouting racial slurs and obscenities at Plaintiff. (*Id.*)

Plaintiff asserts that he was not resisting, failing to comply with Defendants' orders, or attempting to incite the other prisoners. (*Id.* ¶ 14.) When the other prisoners witnessed Plaintiff being assaulted, they became "agitated and aggressive" and began "kicking the

gate" and screaming for Defendant Villanueva to stop. (*Id.* ¶ 16.) Prisoner Rafael Diaz attests under penalty of perjury that he witnessed Defendants Villanueva and Lopez and CO Cornejo escort Plaintiff from the kitchen on May 8, 2018, and asserts that Plaintiff "was not resisting or doing anything." (Doc. 107 at 10 (Diaz Decl. ¶ 11).) Diaz asserts that Defendant Villanueva attacked Plaintiff "for no reason" and that Plaintiff "was not yelling or screaming or failing to comply with any directions." (*Id.* ¶¶ 11, 12.) Plaintiff asserts that:

> [A]nytime a [prisoner] is subdued, in restraints and not resisting, and officers began to use and/or continue to use excessive force against that [prisoner] when that [prisoner] is defenseless and can not protect himself—I myself, will personally attack those officers in defense of the defenseless and every [prisoner] in ADC is obligated to do the same as they are just as likely to one day find themselves in the same situation and would expect someone to step in to defend them or to save their life.

(Doc. 101-1 ¶ 18.)

On May 9, 2018, Plaintiff was transferred from the Dakota Unit to the Browning Unit. (*Id.* ¶ 26.) Upon his arrival, CO Winget and several other officers behaved "aggressive and hostile" towards Plaintiff. (*Id.*) Plaintiff was handcuffed and strapped facedown onto a gurney and dragged around the unit "feet first." (*Id.*) Winget repeatedly made racist, disrespectful, and unprofessional comments towards Plaintiff and told Plaintiff not to speak to anyone or make any sudden movements or else he was going to get "[f---ed] up." (*Id.* ¶ 27.)

In his First Amended Complaint, Plaintiff asserts that Defendant Tribolet "engaged in excessive force by banging the gurney in which [Plaintiff] was strapped and secured to face down [sic], in shackles and handcuffs, into walls and structures and attempting to brake [sic] [Plaintiff's] arm when [his] elbow was slammed into and caught in the bars of the wing gate." (Doc. 16 at 6.)[3] Plaintiff also asserts that Defendant Tribolet "forcefully

---

[3] Where the nonmovant is a pro se litigant, the court must consider as evidence in opposition to summary judgment all of the nonmovant's contentions set forth in a verified

- 8 -

applied contaminated, unsanitary, and bio-hazardous clippers to [Plaintiff's] face and 'force shaving' [Plaintiff.]" (*Id.*)

On May 11, 2018, Defendant Tribolet refused to provide Plaintiff hair and nail clippers. (*Id.* ¶ 32.)

### C. Camera Footage

Security camera footage of the May 8, 2018, incident shows the following events. In the first video, Defendants' Exhibit 4, Plaintiff can be seen in the dining hall involved in a physical altercation with two COs who Defendants have identified as COs Luna-Reyes and Escalante. (DVD, Defs.' Ex. 4 at 0:00–1:00.) There are approximately 30–40 unrestrained prisoners in the dining hall at this time, and Plaintiff can be seen physically resisting Luna-Reyes and Escalante's attempts to restrain him. (*Id.*) A third officer eventually arrives and appears to deploy his pepper spray. (*Id.*) The altercation lasts for approximately one minute before the officers are finally able to restrain Plaintiff. (*Id.*) Once Plaintiff is restrained, the officers stand him up and move him somewhere out of view of the camera. (*Id.* at 1:55–2:00.) Plaintiff is then moved next to the door of the dining hall, accompanied by several officers, and one of the officers holds Plaintiff against the wall, with Plaintiff facing the wall; Plaintiff is eventually escorted through the door. (*Id.* at 2:54–4:05.)

After being escorted out of the dining hall, Plaintiff is taken through the kitchen; this takes about 20 seconds and appears to occur without incident. (DVD, Defs.' Ex. 5 at 0:13–0:35; DVD, Defs.' Ex. 6 at 0:17–0:42.) The footage then shows Plaintiff being escorted outside by Defendants Villanueva and Lopez and one other officer. (DVD, Defs.' Ex. 7 at 0:15–0:40.) At one point, one of the officers, presumably Defendant Villanueva, appears to briefly grab for Plaintiff's upper body area, but the distance and the camera angle makes it difficult to see what actually transpired; this lasts for approximately five seconds. (*Id.* at 0:42–0:47.) The remaining portion of Plaintiff's escort that was captured on camera appears to take place without further incident. (*Id.* at 0:47–1:15.)

---

complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

**V.     Eighth Amendment Excessive Force Claim**

    **A.     Legal Standard**

Use of excessive force against a prisoner violates the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *Graham v. Connor*, 490 U.S. 386, 39394 (1989). The use of force is constitutional if it is used in a good faith effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). Not "every malevolent touch by a prison guard gives rise to a federal cause of action"; thus, de minimis uses of physical force, provided that use of force is not "repugnant to the conscience of mankind," do not offend the Constitution. *Hudson v. McMillan*, 503 U.S. 1, 9–10 (1992).

A court considers five factors in determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm: (1) the extent of the injury, (2) the need for force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force. *Id.* at 7 (citing *Whitley*, 475 U.S. at 321). When reviewing these *Hudson* factors, the court must remember that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321–22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

    **B.     Defendants Villanueva and Lopez**

After applying the *Whitley* factors to the facts at hand, the Court finds that the record does not support an excessive force claim against Defendants Villanueva and Lopez. First, Plaintiff asserts that he suffered lacerations to his mouth and lips when Defendant Villanueva tried to shove the collar of Plaintiff's sweatshirt into Plaintiff's mouth and down his throat. (Doc. 101-1 ¶ 13.) Plaintiff's statements regarding his injuries are within Plaintiff's personal knowledge and constitute evidence of harm. Thus, construing the

evidence in the light most favorable to Plaintiff, Plaintiff suffered minor injury as a result of Defendant Villanueva's actions. This factor tips slightly in Plaintiff's favor.

However, it is undisputed that Plaintiff was involved in a physical altercation with COs Escalante and Luna-Reyes prior to being escorted out of the dining hall by Defendants Villanueva and Lopez. On these facts, the use of the minimal amount of force necessary to restrain Plaintiff so that he could be transported out of the dining area and to a holding cell would not be unreasonable, and under these circumstances, Defendants Villanueva and Lopez's purported actions—yanking Plaintiff's shirt and trying to stuff it in his mouth—did not amount to a significant use of force.

Moreover, prison officials confronted with a prison disturbance must balance the threat unrest poses to prisoners, prison staff, and visitors against the harm prisoners may suffer if guards use force. *Hudson*, 503 U.S. at 6. In analyzing the relationship between the need for force and the force used, a simple overreaction by an officer is not enough to establish an Eighth Amendment violation. Under the Eighth Amendment, the standard is malicious and sadistic force, not merely objectively unreasonable force, which is applicable under the Fourth Amendment. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002); *see Hudson*, 503 U.S. at 9 (not every malevolent touch gives rise to an Eighth Amendment claim). The infliction of pain in the course of a prison security measure is not cruel and unusual punishment "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. In other words, even if an officer engages in more force than is reasonably necessary to maintain safety and security, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.*

Defendants have presented evidence that prisoner disturbances, particularly struggling or fighting with a correctional officer, pose a security risk because it can agitate other prisoners and incite further violence. (Doc. 75 ¶ 25.) This was a particular concern that day due to the fact Plaintiff had just assaulted two correctional officers and the fact

that none of the other prisoners were restrained. (*Id.* ¶ 26.) Ensuring that none of the other prisoners became involved with Plaintiff's escort was in the interest of the safety of the other correctional officers, Plaintiff, and the other prisoners. (*Id.* ¶ 27.)

Assuming Defendant Villanueva yanked on Plaintiff's shirt and attempted to stuff Plaintiff's shirt collar into his mouth, although this may have been an overreaction, it does not amount to cruel and unusual punishment unless the pain was inflicted maliciously and sadistically for the very purpose of causing harm. This burden is very high and requires more than an unreasonable use of force. Plaintiff has failed to meet this burden. Because correction officers "must make their decisions in 'haste, under pressure, and frequently without the luxury of a second chance,'" they are to be given wide deference in the execution of practices that they believe are needed to preserve order. *Hudson*, 503 U.S. at 6 (internal citation omitted). Courts must keep in mind that the Eighth Amendment does not prohibit uses of force that appear unreasonable in hindsight, as long as the officers were acting in good faith and for a legitimate end. *See Whitley*, 75 U.S. at 322. The uncontroverted evidence shows that Plaintiff had assaulted two officers just before Defendants Lopez and Villanueva escorted him out of the dining and kitchen area. Further, in the aftermath of Plaintiff's assaultive behavior, it was reasonable for Defendant Villanueva to perceive some threat when Plaintiff tried to talk to prisoners outside the building while he was being escorted from the area. On these facts, assuming Defendant Villanueva yanked on Plaintiff's shirt and tried to stuff it in Plaintiff's mouth so that he could not communicate with the other prisoners, such conduct did not amount to malicious and sadistic for the very purpose of causing harm. Here, Defendant Villanueva's actions were consistent with trying to preserve order and maintain security. *See Hudson*, 503 U.S. at 6. Defendants Villanueva and Lopez used only the force necessary to restrain Plaintiff so that he could be safely transported out of the building.

On reviewing the facts, including the video recording of Defendants Lopez and Villanueva's escort of Plaintiff from the dining hall and kitchen area, there is no evidence in the record to support a finding that Defendants Villanueva and Lopez implemented force

maliciously and sadistically for the very purpose of causing harm. Based on the foregoing, the majority of the *Hudson* factors favor Defendants Villanueva and Lopez, and as a result, summary judgment will be granted to these Defendants.

### C. Defendant Tribolet

Defendants argue that Defendant Tribolet was working in the control room on May 9, 2018, and was not involved in any use of force against Plaintiff on that day. (Doc. 74 at 4–5.) The Court notes that in *Nissan*, one of the defendants submitted affidavits stating that its representatives never received a timely notice required for plaintiff's damages claim, thereby meeting its initial burden of production by negating an essential element of that claim, whereas another defendant did not. 210 F.3d at 110 6-1107. Here, Defendants have failed to produce any such affidavit evidence showing that Defendant Tribolet was not involved in the May 9, 2018, incident. Defendant Tribolet's signed declaration does not include facts regarding his whereabouts during the incident on May 9, 2018, or facts regarding his assignment to the control room that day. (*See* Doc. 75-1 at 71–72 (Tribolet Decl.).)

In other prisoner cases where the defendants have tried to discharge their initial burden of production by directing the court's attention to the mere absence of evidence supporting the nonmovant's case, the Ninth Circuit has explained that it is not sufficient simply to assert that the plaintiff has no evidence—Defendants must show it. To discharge its initial burden, a movant must "point to shortfalls in the [plaintiff's] case to demonstrate the absence of evidence . . . ." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1543 (9th Cir. 1989); *see Celotex*, 477 U.S. at 332 (Brennan, J., dissenting) (a conclusory assertion that the nonmovant has no evidence is insufficient; the movant must affirmatively show the absence of evidence in the record and discharge its burden of production by deposing nonmovant's witnesses or establishing inadequacy of documentary evidence); *see also Celotex*, 477 U.S. at 319 (the defendants pointed to and relied on the plaintiff's responses to interrogatories to show the absence of evidence.)

Because Plaintiff is proceeding pro se, the Court must avoid applying summary judgment rules strictly. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). Further, as mentioned, Plaintiff's verified First Amended Complaint is evidence in opposition to summary judgment. *See Jones*, 393 F.3d at 923; *McElyea v. Babbitt*, 833 F.2d 196, 197 n.1 (9th Cir. 1987) ("for purposes of Rule 56(e), [a] verified complaint may be treated as an affidavit . . ."; therefore, a verified complaint meets the affidavit requirement in *Celotex* that the nonmovant "go beyond the pleadings and *by her own affidavits* . . . demonstrate genuine issues of fact") (internal citations omitted).

Plaintiff asserts that on May 9, 2018, Defendant Tribolet and other officers strapped Plaintiff facedown onto a gurney, then proceeded to bang the gurney into walls and various other structures and attempted to break Plaintiff's arm in the process by slamming Plaintiff's elbow into the bars of the wing gate. (Doc. 16 at 6.) Plaintiff also asserts that Defendant Tribolet "forcefully applied contaminated, unsanitary, and bio-hazardous clippers to" Plaintiff face and force shaved him. (*Id.*) Accepting Plaintiff's verified statements as true, Plaintiff's factual assertions are sufficient to establish a genuine material issue of fact as to whether Defendant Tribolet's use of force was done maliciously and sadistically for the very purpose of causing harm.

For the foregoing reasons, summary judgment will be denied without prejudice as to Plaintiff's claim against Defendant Tribolet with leave to re-file a second motion for summary judgment limited solely to the claim against Defendant Tribolet so that Defendants may present complete copies of their evidence in support of summary judgment.[4]

. . .

. . .

---

[4] As best the Court can tell, it appears that the exhibits in support of Defendants' summary judgment motion, which was filed on the court's ECF system, inadvertently omits page 2 of the Tribolet declaration.

- 14 -

Accordingly,

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 74), Plaintiff's Motion for Injunctive Relief (Doc. 112), and the Motion to Extend Deadline to Respond (Doc. 114).

(2) Defendants' Motion for Summary Judgment (Doc. 74) is **granted** as to Plaintiff's Eighth Amendment claims against Defendants Villanueva and Lopez, and the Motion is **denied without prejudice** as to Plaintiff's Eighth Amendment claim against Defendant Tribolet.

(3) Defendants Villanueva and Lopez are **dismissed with prejudice**.

(4) Plaintiff's Motion for Temporary Restraining Order (Doc. 112) is **denied**.

(5) Defendants' Motion to Extend Deadline to Respond (Doc. 114) is **denied as moot**.

(6) **Within fourteen (14) days** of the date this Order is issued, Defendants may file a second motion for summary judgment limited solely to Plaintiff's remaining claim against Defendant Tribolet, **and must include complete copies of all supporting exhibits**. Plaintiff' response is due within **fourteen (14) days** of being served the second motion for summary judgment. Defendants may file a reply within **seven (7) days** of receiving Plaintiff's response.

Dated this 2nd day of March, 2022.

_Michael T. Liburdi_
Michael T. Liburdi
United States District Judge